[L. A. No. 918.   Department Two.—April 3, 1902.]

# KATE S. VOSBURG, Respondent, v. JOHN S. VOSBURG, Appellant.

DIVORCE—DESERTION—REFUSAL OF MATRIMONIAL INTERCOURSE—PLEADING—PERSISTENT REFUSAL.—A complaint in an action for a divorce on the ground of desertion, which charges that on a date more than one year prior to the commencement of the action the defendant, without cause or reason, withdrew from the marriage bed, "and ever since said time has refused to have reasonable or any matrimonial intercourse with the plaintiff," as matter of pleading adequately charges the persistency of the refusal as against a general demurrer, though not using the words "persistent refusal" employed in section 96 of the Civil Code.

ID.—SUFFICIENCY OF EVIDENCE—PERSISTENT SEPARATION BY HUSBAND—SOLICITATION BY WIFE NOT REQUIRED.—Evidence showing that the husband without cause separated himself from the marriage bed, and did not thereafter seek a renewal of matrimonial intercourse, for more than one year, is sufficient to show a persistent refusal thereof by him, and it is not required, in order to show such refusal, that the wife shall solicit his return to the marriage couch.

ID.—RECRIMINATION—DESERTION BY WIFE—CHOICE OF HOME BY HUSBAND—ABSENCE OF GOOD FAITH—DELAY IN OFFER.—A recriminatory plea by the husband, alleging desertion by the wife for not conforming to his choice of a reasonable place and mode of living, is not sustained where it appears that they had lived for years in a suitable home belonging to the wife, among her friends, and that his choice of a different home was not made in good faith, and that his offer of another suitable home elsewhere was not made until after her cause of action against him for a divorce became perfected.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. Waldo M. York, Judge.

The facts are stated in the opinion of the court.

Works, Lee & Works, for Appellant.

J. S. Chapman, and Charles Silent, for Respondent.

HENSHAW, J.—This is an action for divorce. The complaint charged in two counts, the one for desertion, based upon defendant's failure and refusal to have reasonable matrimonial intercourse; the other for extreme cruelty. The court found for plaintiff upon the first count, and upon the second made findings touching the alleged acts of cruelty, but failed to find specifically and in terms that defendant had been guilty of extreme cruelty. Its conclusion of law was, that plaintiff was entitled to a divorce, and the judgment and decree followed accordingly.

Defendant demurred to the sufficiency of the complaint concerning the charge of desertion, and here presses his demurrer. The count in the complaint objected to is as follows: "The plaintiff further avers that, heretofore, to wit, on the first day of October, 1896, the said defendant did willfully desert and abandon the said plaintiff and separate himself from her and withdraw from the marriage bed, and ever since said time has refused to have reasonable or any matrimonial intercourse with plaintiff, and has ever since occupied a separate room, and has never at any time since cohabited with the plaintiff; and that such separation and refusal to have matrimonial intercourse with plaintiff was without cause and without the consent and against the will of the plaintiff. And plaintiff further avers that at no time during the said separation, from the time of its beginning, neither the health nor the physical condition of the said defendant did make such refusal to have reasonable matrimonial intercourse necessary, and that said separation and refusal was without any cause whatever, and such desertion was continued for more than one year prior to the commencement of this action."

The Civil Code (sec. 96) declares that "Persistent refusal to have reasonable matrimonial intercourse as husband and

wife, when health or physical condition does not make such refusal reasonably necessary . . . when there is no just cause for such refusal, is desertion.'' The attack made upon the sufficiency of this pleading is, that it fails to allege the ''persistent refusal'' contemplated by the code. It is true that in terms the word ''persistent'' is not used, but it is specifically charged that on a given date, without cause or reason, he withdrew from the marriage bed, and ''ever since said time has refused to have reasonable or any matrimonial intercourse with plaintiff.'' As matter of pleading, certainly the persistency of the refusal is thus adequately charged. The demurrer, therefore, was properly overruled.

Upon this count the finding of the court was to the effect that the allegations of plaintiff's complaint, as amended, constituting the first cause of action therein, are true as stated in said amended complaint. This finding, if supported by the evidence, is sufficient to sustain the decree of the court without reference to the second count, charging cruelty, and to the findings which the court thereon made. It, therefore, first invites consideration.

Plaintiff and defendant intermarried, in Los Angeles, in June, 1885. Plaintiff was the cultured daughter of wealthy parents, whose home was, and for many years had been, at Los Angeles. Up to the time of her marriage she had lived with her parents. Her friends and acquaintances were in the city of Los Angeles. Her social surroundings were the most refined, and she was herself at the time of marriage a religious woman, interested in charitable work, and finding her enjoyment in the love of this work, of music, and the finer arts. As a wife and mother it is uncontested that she was devoted to her home and to her children. Defendant was in the enjoyment of a fortune estimated at $150,000. For a time after their marriage they resided at the home of the wife's father. Thereafter the father gave to his daughter a lot of land adjoining the home place, and it was understood that the husband from his means would erect thereon a suitable dwelling for his family. The wife's father also gave to her an unimproved tract of orchard land at Azusa, near Los Angeles. At the same time he gave to Mrs. MacNeil, another married daughter, a like piece of land. Indeed, the whole tract, amounting to many hundred acres, was not at the time for-

mally segregated and divided between the two daughters. An arrangement was made whereby the two sons-in-law, MacNeil and Vosburg, were to superintend the cultivation of these respective tracts of land. Upon the part of Vosburg, he testified that he was reluctant to enter into this agricultural pursuit, as the bent of his inclination was not in that direction, but that he agreed to do so upon the express conditions,—1. That his wife should repay to him such advances as he might make out of his own funds, in the improvement of the land; and 2. That she would in proper time make her home with him upon the ranch. It is not disputed that he was to receive back such moneys as he expended upon the place, but it is denied that there was any express understanding that the future home of the parties was to be at Azusa, though (such is the testimony on behalf of plaintiff) there was not during this time any positive refusal on her part to make her home there, if in the future it should seem desirable. The joint management by the brothers-in-law continued until 1892, when each took charge of his separate tract, and Mr. Vosburg managed his wife's part until 1895. During this period children were born to them, and their married life was happy. In August of that year Mr. Vosburg informed his wife that he was tired of taking care of the ranch, that he hated it, and that he never wanted to see it again. Her father was then absent from home, and she asked him to continue in charge until his return, when some other arrangement might be made. Upon the father's return, a stormy interview between the two followed. The first matter of difference was the boundary-line between the Vosburg and MacNeil properties, and Vosburg charged Mr. Slauson with acting as if he were the paid attorney of MacNeil. The father-in-law replied: "John, that is a very unjust, uncalled-for, and contemptible remark for you to make to me." Vosburg jumped up, with his fist clenched, and stepped forward, saying: "Be damned if I will stand that remark from you." He cursed Azusa, and wished that he had never seen the place. He then arraigned his father-in-law for bad faith in the matter of the testamentary disposition of his property, and this, it appears, grew out of the following circumstances: Mr. Vosburg said that at the time of his marriage Mr. Slauson told him that he had left his property by will to his children. Thereafter, when Mr. Slauson was about

to make a trip to Victoria, he intrusted his will, sealed within an envelope, to the custody of Mr. Vosburg. Mr. Vosburg charged Mr. Slauson with perfidy in the matter of the will, saying that he had not left his property to his children; and, when Mr. Slauson asked him how he knew, declared that he had opened the will so intrusted to him, and had taken a copy of it. The result was that Vosburg refused longer to manage the ranch, and the charge of it was taken over by Mr. Slauson and his son. The Vosburgs at this time, and for some years prior thereto, had been living in their own house, built upon the lot of land adjoining the family home, which, as has been said, was given by Mr. Slauson to his daughter. Upon the land had been erected a handsome dwelling, which with its outbuildings cost from twenty-four thousand to twenty-six thousand dollars. It was a suitable home for people of their means and in their station of life, and it was near to the home of Mrs. Vosburg's parents, both of whom were living, and to both of whom she was devotedly attached. Shortly after these occurrences Mr. Vosburg presented to his wife for her signature an acknowledgment that she owed him upon account of his expenditures on the Azusa ranch the sum of thirty-eight thousand dollars. He says she signed this willingly and without question. She says that he pressed her to sign it; that she said that she did not think that she owed him so much; he said the books were there to prove it; that she looked at the books, but could not understand them; that while it had been agreed that her husband should be repaid for his expenditures upon the ranch, it was also understood that he was to be repaid for those expenditures out of the profits of the ranch; and that she signed this acknowledgment under protest. She did not at the time tell her father of the matter, but some months afterwards mentioned it to her sister, Mrs. MacNeil, and she in turn informed the father. Another angry interview between the two men followed. Mr. Slauson accused his son-in-law of having extorted the acknowledgment from his daughter, charged that the amount was excessive, and asserted that she was being robbed. The points of difference grew out of these facts: There had been a sale of some of the Azusa land during Mr. Vosburg's management of it, from which he received some sixteen or seventeen thousand dollars. There were eleven hundred dollars more received from the sale of a right of way. Mr.

Vosburg contended that this money, under his wife's direction, had been expended in the building of their Los Angeles home; that he had agreed to expend of his own funds upon that home the sum of seven thousand dollars only; and that the excess remaining after deducting seven thousand dollars from the cost price of twenty-four thousand or twenty-six thousand dollars, accounted for the money which he had thus received. Mrs. Vosburg and her father, upon the other hand, insisted that the understanding was that the husband from his own means was to build the house; that the amount of money to be expended for that purpose was not limited by Mr. Vosburg; that the charge, therefore, was an improper one; and that the sum of thirty-eight thousand dollars should be reduced by these amounts. There was much feeling, lawyers were consulted, and the matter was finally adjusted by Mr. Slauson giving to his son-in-law his personal note for twenty thousand dollars. Upon the one hand it is contended that this was all and more than all that was Mr. Vosburg's due. Upon the other hand it is insisted that this was a concession which he made from his just demands for the sake of peace. And here it should be said that this statement of the case is made from the view which the court evidently entertained of the weight of the evidence; for upon almost every matter of consequence, the testimony of the opposing parties is in sharp conflict and dispute. Following these troubles Mr. Vosburg showed an earnest desire to break up their family home in Los Angeles and move away. He urged upon his wife that they should go elsewhere and make their home, and to this she persistently refused to give her assent. Trifling considerations, such as the effect of the Los Angeles climate upon his health, such as the injury to the children from being overfed by a too indulgent grandmother, are presented as reasons for Mr. Vosburg's desire to move his household away, but the essential reason— and this is not disputed—was the estrangement and bitterness that had grown up between him and his wife's family. Mrs. Vosburg, he testifies, told him that she had ceased to care for him or ceased to love him. This she denies, and says that what she told him was not that she had ceased to care for him,—that she did care for him,—but that since the Azusa ranch transaction she had ceased to trust him; that she loved her father better than any man, because his love and devotion to her had

never failed. The strained relations continued, though the
relationship of husband and wife was maintained. To Mr.
Vosburg's request that they should go elsewhere to live Mrs.
Vosburg in effect responded that she would not do so; that she
could see no reason for breaking up their home in Los Angeles,
where they were surrounded by family and friends, and that
for her part she would do all that was in her power to make his
home life there a pleasant and happy one. Minor differences,
as was inevitable in this situation of affairs, sprang up be-
tween them. Mr. Vosburg refused to allow more than one
hundred dollars per month toward the family expenses, and
from this amount from time to time would make deductions,—
as five dollars which he paid the letter-carrier, as a small sum
for the care of the cemetery lot where their infant child was
buried, as twenty-five or thirty-five cents which he had expend-
ed for the purchase of shoe-laces and shoe-polish at her re-
quest,—at the same time accusing her of not being a woman of
her word, because she had promised to repay this amount to
him and had not done so. He brought from the East some
buckwheat flour and maple syrup that cost twenty-two dollars,
and insisted upon deducting the amount of it from her month-
ly allowance, contending that she would eat as much of it as he.
On his visit East he claimed, as he was not at home to board,
the cook's wages should be deducted from her allowance. He
swore when she suggested that he ought to pay his own extra
laundry bills, and told her, if she should incur any debts in his
name, he would go around and tell the tradespeople not to
trust her. He became profane because, when dressing for an
evening call, she burned two jets of gas in her apartments, and
told her that he would not permit it. He displayed rudeness
to the guests in their home, refused to wait for them at dinner
parties which assembled at the table, and would seat himself
and begin to carve before the others came into the room. He
charged his wife with stealing twenty thousand dollars from
him, having reference to the settlement which had been made
between him and her father. He sneered at her religious views,
and objected to her sending the children to Sunday-school.
He charged her in the presence of guests with eating celery
like a cow, and upbraided her in a coarse and offensive manner
for occasionally omitting to shut a door, using such language
as "God damn it, why don't you close the door. I will teach

you to shut doors. Shut the door, or I will know the reason why.'' She testifies that at first she thought he was going insane, and she became afraid of him. She did not think there was any sincerity in his proposals that they make a home elsewhere, and was both afraid and unwilling to move away and deprive herself of the protection of her own people. In the fall of 1896 Mr. Vosburg returned from an Eastern trip upon which he had taken one of the children. Upon the day of his arrival he informed his wife that he was tired from his trip, and desired to sleep alone. Up to this time during their married life they had occupied the same room and couch. He was provided with another room, and on the following day told his wife that he wanted a room of his own. It was provided for him, and he continued to occupy it during all the time thereafter while he remained in the house. In this his wife's wishes were never consulted, nor did he ever confer with her as to her views of the matter or her ideas in that regard. Asked if she had or made any objection to the change in their mode of life, she answered that she did have a decided objection, as she did not consider it a proper way for husband and wife to live, but that she did not express her objections to him, and merely acceded to the request which he made. That matrimonial intercourse ceased from that time is not disputed. Their domestic affairs went from bad to worse, culminating when some time later the husband made a second trip to the East with two of the boys, under the pretense that it was but for a visit, and under promise to bring them back, and returned without them, admitting subsequently that his intention was not to return them. Upon this last occasion he again requested his wife in a written communication, framed with the assistance of his attorney at law, to go with him and live with him in a pleasant and suitable home which he had provided for her in the state of New York. This she declined to do. She took the train for the East with her father and instituted *habeas corpus* proceedings in the courts of New York to recover her children. Upon her return to California, this action was instituted in 1898.

Defendant, while admitting his separation from the marriage bed, seeks to explain and justify it for various reasons. He slept badly, and his wife would come into the room after he had retired and disturb his rest. She had ceased to care for

him, and it was mockery of the marriage state to maintain its relations. When the condition of his health had improved, he did offer to return, but she expressed her satisfaction with the then existing arrangement. All of these reasons are denied. He finally advances another, which involving, as it does, the disclosure of the secrets of their marriage chamber, should not, if true, have come from his lips, but which, being proven false, presents his character in a discreditable light.

But it is still urged that the evidence falls far short of showing the persistent refusal to have reasonable matrimonial intercourse which our law considers a ground for divorce. There is no occasion here for a homily upon the difference in sexes, and it is sufficient to say that when a husband without cause so separates from his wife and never thereafter seeks a renewal of intercourse, it is not contemplated that, to make his refusal persistent, the wife shall be called upon to solicit his return to the marriage couch. We conclude, therefore, that the finding of desertion is fully sustained by the evidence.

Against plaintiff's whole case, however, defendant has urged the recriminatory plea of desertion upon her part. This alleged desertion is based upon section 103 of the Civil Code, which provides that "the husband may choose any reasonable place or mode of living, and if the wife does not conform thereto, it is desertion." Herein it is urged that the persistent refusal of the wife to live elsewhere with her husband than at her Los Angeles home, which refusal antedated his separation from her bed, and continued persistently long thereafter, constituted desertion upon her part. Nice questions may arise as to the extent of the duty of the wife in this regard, and as to the extent of the right of the husband, without adequate reason, to force the wife to leave the place where she has long resided, where her friends are gathered about her, and where, near to her aged father and mother, she is living in her own house and home suitable to her station and condition in life. There must certainly be a limit to the husband's right of exaction in this regard, and the answer to the question in this case, if answer were needed, might be a justification, under all the circumstances shown, for the wife's refusal. But it is not necessary here to answer that question. The law has limited the husband's right to "choosing any reasonable place." It is when, and only when, he has so chosen a reasonable place,

and the wife has refused to go to him and make her home at that place, that this cause of action for desertion arises. It here never arose. There was much discussion as to the selection of a new home. There was much urging upon the part of the husband, met with protestations and refusals upon the part of the wife, but during all of the time it remained but a subject of family discussion, over which the two spouses disagreed. The wife was never in default, because the husband had not chosen and did not choose the new home. It may have been that, knowing his wife's disposition and temperament. he was satisfied that, if he did choose such a home, she would not go to it, but, nevertheless, she was not guilty of desertion until he had made the choice, offered it to her, and she without sufficient cause had refused to comply with his selection. This, as has been said, he did not do. At least, he did not do so until long after the lapse of time which ripened his desertion of her into a cause of action for divorce. Upon his return from his last trip to New York, he did, as has been said, notify her that he wished her to go to that state and there live with him in a pleasant and suitable home which he had provided for her. The court finds, and the evidence sustains the finding, that this offer was not made in good faith; that he had rented in an obscure oil village in New York a cheap house, for three months, at a monthly rental of eight dollars. But even if the offer had been made in good faith, and if the home provided had been a suitable one, still, as has been said, it came too late to operate against her perfected cause of action.

The judgment and order appealed from are therefore affirmed.

McFarland, J., and Temple, J., concurred.

Hearing in Bank denied.