[Civ. No. 7780. First Appellate District, Division One.—September 24, 1932.]

MARY ALVES, Appellant, v. MANUEL ALVES, Respondent.

C. W. White and Jos. J. Sims for Appellant.

J. E. Rodgers and A. F. Bray for Respondent.

LANDIS, J., *pro tem.*—Plaintiff sued defendant for a divorce on the grounds of wilful neglect and wilful desertion. Defendant answered, and in a cross-complaint charged plaintiff with and sought a divorce from plaintiff upon the ground of wilful desertion. The court denied the prayer of plaintiff's complaint and adjudged defendant entitled to a divorce upon the ground of wilful desertion. This appeal is by the plaintiff from the interlocutory decree adjudging defendant entitled to the divorce.

In his cross-complaint respondent charges appellant's desertion as follows: "That on or about the 25th day of November, 1928, and more than one year last past, the said cross-defendant, disregarding the solemnity of her marriage vows, wilfully and without cause, deserted and abandoned the cross-complainant and ever since has, and continues so to wilfully and without cause abandon said cross-complainant and to live separate and apart from him, without any sufficient cause or any reason, and against his will and without his consent."

Appellant contends that the said interlocutory decree is not supported by and is contrary to the evidence, and is against law for the following reasons: (1) That there is no evidence showing wilful desertion of defendant, by plaintiff; (2) that there was no corroboration of the claim of desertion, as required by section 130 of the Civil Code.

The following are the facts as set forth in respondent's brief, and appear to substantially cover the controlling facts, stated most favorably to respondent, to wit: Defendant testified that he left the then home of plaintiff and defendant at Hayward, because it was costing him too much money to live in town, and he had obtained work in the Bollinger canyon in Contra Costa County for a man named Silveira at the Bettencourt place; that Mrs. Alves stated to him that she would not move out into the country with him anywhere, that she would not leave her family, which consisted of her sons and daughter, who were then living in Hayward. ''Q. And will you state to the court the circumstances under which you left? A. Well, the reason I left home, was because I was working up in the Bollinger canyon, for a party by the name of Silveira. Q. Is that on what they call the Bettencourt place? A. That is the Bettencourt place, and I couldn't—it was costing me too much money to live in town, and I told the wife that we had to move out of town. I didn't tell her that we were going to move up there. I just mentioned it to her, we had to pull out of town. She told me she wouldn't leave her family to move out in the country with me nowheres, so I just simply walked out. I told her I couldn't make it go in town. . . . We had our family all raised; the youngest girl was getting sixty-five dollars a month, and I couldn't make ends meet, so I just simply told her, 'We have to pull out of town.' 'Well,' she said, 'I wouldn't leave my family to go with you out in the country nowheres.' Of course she had an idea I was offered a house with Mr. Silveira, I was working for. He offered me a house free of charge to live. I never mentioned this to her, but she had an idea; she got it from the outside that I had a house I wanted to live in, and she told me she wouldn't leave the family to go out in the country nowhere, so I just dropped the matter there. . . . Q. When was it your wife told you she wouldn't live with you in the country anywhere? A. This was when I was working for this Mr. Silveira. That must have been along about in the month of November sometime. I had just been working there a short while. I had been working there just about a month and then I went home and I handed her thirty-five dollars. I said, 'Here's thirty-five dollars towards

paying the house rent'; we were paying thirty-six dollars a month house rent in town, and she threw the money back at me. The youngest boy was with her; he was there. She threw the money back at me, and said, 'Keep the money; I don't want your money.' She said, 'My boys will help me keep up the house.' I said, 'All right.' I took the money and put it back in my pocket. She said I could come home. I felt I wasn't welcome at home; if I couldn't keep my home, I wasn't welcome: if my children had to keep a home for me, I wouldn't go home. I was willing to provide a home for her any place. I am willing to provide a home for her now, providing she moves where I can get employment. I couldn't get employment in Hayward. I haven't any trade; I work at farm work; she refuses to live out in the country with me. I have no way of traveling back and forth to my work; I have no machine. I am willing to provide a home for her now, if she is willing to live wherever I can get employment. . . . Q. How do you mean you felt you weren't welcome, in what way? A. Because they had no use for me, none of them. They haven't none of them come to see me since I left home. I think the least they could do, is come and see me, because I always provided for them, the same as any father could a family. . . . Q. Did you ever talk to your wife about coming to live with you in the country after that time in November, when she said she wouldn't live with you in the country? A. No, I did not. Q. Why not? A. Because I knew it was no use. The Court: Is that because she told you before? A. Because she told me before she wouldn't come and live with me out in the country nowheres. There was no use in fighting with her, to come out, if she didn't want to come out. . . . The Court: Were your relations with your wife pleasant, at that time? Were you friendly with your wife at that time? A. We weren't on very good speaking terms, because she didn't want to move where I wanted to move. . . . I didn't tell her to come and live in Bollinger canyon. I told her we had to move out of town, because we couldn't make it in town, and she told me she wouldn't leave the family to live with me in the country no place, and the youngest boy said: 'No, you ain't taking mother to the "Styx" nowhere. We're keeping this house.' I said,

'All right, if you are keeping this house, you can go to it, I am out. . . . Q. Was your wife there at the time when he said that? A. She was right there with him. Q. Did she make any remark? A. —But she didn't make any remark. . . . The Court: Q. What kind of a home could you have provided for her in Bollinger canyon? A. There was a nice house in Bollinger canyon.''

It is obvious that the decree must find support, if any, in the charge of desertion, under the provisions of section 103 of the Civil Code, whereby it is provided that ''The husband may choose any reasonable place . . . of living, and if the wife does not conform thereto, it is desertion.''

Briefly reviewing the evidence most favorable to respondent, it is shown that the parties had been living in Hayward about two years, in a rented house; defendant worked out at different places and finally went to work in the Bollinger canyon in Contra Costa County; he would return to the Hayward home first every week, and then every two weeks, and finally stayed away entirely. According to defendant's testimony, on one of the trips home in November he said to his wife, '' 'We have to pull out of town.' . . . It was costing me too much money to live in town. . . . I didn't tell her that we were going to move up there [to Bollinger canyon]. I just mentioned it to her, we had to pull out of town. She told me she wouldn't leave her family to move out in the country with me nowheres, so I just simply walked out. I told her I couldn't make it go in town. . . . Of course she had an idea I was offered a house with Mr. Silveira, I was working for. He offered me a house free of charge to live. I never mentioned this to her, but she had an idea; she got it from the outside that I had a house I wanted to live in, and she told me she wouldn't leave the family to go out in the country nowhere, so I just dropped the matter there. . . . After that time in November, when she said she would not live with me in the country, I never talked to her about coming to live in the country, because I knew it was no use.''

In the case of *Bibb* v. *Bibb*, 39 Cal. App. 406, 409 [179 Pac. 214, 215], and supported by abundant authorities therein cited, the court says: ''Ordinarily, the husband may choose the family domicile at pleasure. It is the

wife's duty to follow his fortunes—'to go whither he goeth'—and abide in that place where it is most convenient for him to enjoy her society, and where he is able and willing to make provision for her support and that of his family. But his right to determine the family abode does not give him an entirely arbitrary power; it is not without its limitations. He is bound to provide and establish a suitable home for his wife, ere he can insist that she follow him. The law has limited his right to change the family abode. It is so limited that he can only 'choose any reasonable place . . . of living.' (Civ. Code, sec. 103.) It is when, and only when, he has so chosen and established the new domicile, and, in good faith, has made offer of the new abode to her, and she, without a sufficient cause, has refused to comply with his selection, that a cause of action for desertion arises.''

In this case, the most that can be said in support of the wife's desertion is that she informed her husband that she would not follow him. There is no showing that defendant had established a new domicile; not a word of testimony that he had offered to her or requested her to go with him to any particular place. By affirmative evidence he must not only show that he has established a new domicile, but must show its character and its suitableness. (*Kenniston* v. *Kenniston,* 6 Cal. App. 657 [92 Pac. 1037].) No presumption in that regard can be indulged in his favor.

As said by the court in *Bibb* v. *Bibb, supra:* ''It is not enough that, prior to his establishing the new domicile, she informs him she will not follow him. For perchance, he may accede to her wishes and not make the change; or she, perhaps, when the new domicile shall have been actually chosen and established, may exercise a woman's privilege and change her mind. The law does not countenance a divorce for a mere disagreement as to whether a contemplated change shall or shall not be made. Her duty is to follow him if and when he actually moves to a new, but suitable, domicile. Until he moves she cannot follow. Nor is she in default, until having established a new domicile, he has offered it to her and requested her to follow him. Until such offer and request be made, and she [is] thereby informed as to the location and character of the place

chosen by the husband, she cannot know whether it is a 'reasonable place of living'. ''

And as said by the court in the case of *Vosburg* v. *Vosburg,* 136 Cal. 195, 204 [68 Pac. 694, 697] : '' . . . she was not guilty of desertion until he had made the choice, offered it to her, and she without sufficient cause had refused to comply with his selection. . . . If it be his intention, to visit upon his wife the penalty of her failure to follow him to the new domicile, he should present to her, in plain and unequivocal terms, the alternative of a compliance with his wishes or a surrender of all her conjugal rights. (*Hardenbergh* v. *Hardenbergh,* 14 Cal. 654.) Unless such alternative be so presented to her, it cannot readily be ascertained whether or not she harbors an actual intent to desert him; and the actual intent to desert is as much an essential ingredient of the desertion as is the voluntary separation itself. (Civ. Code, sec. 95; *Hardenbergh* v. *Hardenbergh, supra.*) '' (*Bibb* v. *Bibb, supra,* at p. 410.)

Defendant failed to present to his wife, clearly and definitely, the alternative of a compliance with his will to move to any particular place, or be deemed guilty of desertion.

Viewing the facts disclosed by the record in the light of these principles of law, we are constrained to hold that the trial court erred in granting a divorce to respondent.

Judgment reversed.

Knight, Acting P. J., and Cashin, J., concurred.